**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERTY | : | CIVIL ACTION |
| AND CASUALTY COMPANY | : | NO. 302CV1566 (MRK) |
| | : | |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| PHILIP L. CAOUETTE; and KIMBERLY | : | |
| CAOUETTE, | : | |
| | : | |
| Defendants | : | MARCH 29, 2004 |

**JOINT TRIAL MEMORANDUM**

In accordance with the Standing Order Regarding Trial Memoranda in

Civil Cases and the Court's Joint Trial Memorandum Instructions in Nonjury

Cases, the parties submit the following information:

1.    **TRIAL COUNSEL**

For the Plaintiff, American National Property and Casualty Company:

Daniel P. Scapellati, Esq.
Halloran & Sage, LLP
225 Asylum Street
One Goodwin Square
Hartford, Connecticut 06103
860-297-4622

For the defendants, Philip Caouette and Kimberly Caouette:

David S. Rintoul
Brown Paindiris & Scott LLP
2252 Main Street
Glastonbury, CT 06033
(860) 659-0700

2.    **JURISDICTION**

Jurisdiction is based on diversity jurisdiction pursuant to 28 U. S. C. §1332 and 2201.

3.    **LENGTH OF TRIAL**

One day.

4.    **FURTHER PROCEEDINGS**

None.

5.    **NATURE OF CASE**

**Plaintiff:**     This is a declaratory judgment action pursuant to which American National Property and Casualty Company (hereinafter referred to as "ANPAC") is seeking a judgment declaring that it has no obligation to provide underinsured motorist coverage in connection with an automobile accident alleged to have occurred on October 9, 1998 (the "Accident") under an automobile liability insurance policy bearing policy number 22-A-J21-113-5 (hereinafter referred to as the "Policy") ANPAC issued to the defendants, Philip L. Caouette and Kimberly Caouette.  ANPAC believes that the Policy was cancelled by the defendants effective October 6, 1998, three days prior to the accident.  Accordingly, ANPAC believes that the insurance coverage provided under the Policy does not apply to any claims asserted by anyone in connection with the Accident.

**Defendants:**     The defendants assert that any purported cancellation of the Policy was revoked when defendants gave notice to ANPAC that they were  making a claim on the Policy relating to the Accident prior to

ANPAC's processing the purported cancellation.  Defendants futher assert
that ANPAC ratified the revocation of the cancellation by acting in all
respects as if the Policy was in effect on the date of the Accident for more
than two years.  The defendants further claim that ANPAC is estopped
from claiming that the Policy was cancelled because for more than two
years, ANPAC acted as if the Policy was in effect with respect to the
Accident.  The defendants also claim that because they earned benefits
under the Policy for the Accident prior to ANPAC's processing the
defendants' cancellation request, their right to benefits under the Policy
vested and could not be affected by the processing of the cancellation of
the Policy.

6.  **STIPULATIONS AND PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**Stipulations Of Fact**

1.  The Policy was issued in Minnesota to the defendants while they
    were Minnesota residents, insuring vehicles, including the one
    involved in the Accident, registered and garaged in Minnesota.
    (Certified copy of the Policy).

2.  The effective date of the Policy was August 1, 1997 and it was
    renewed effective August 1, 1998.  (Certified copy of the Policy).

3.  The Policy, while it was in effect, afforded uninsured/underinsured
    motorist coverage with a limit of $100,000.00 per person and
    $300,000.00 per accident.  (Certified copy of the Policy).

4.      Although the Policy has a $100,000.00 per person limit, there is only $80,000.00 in coverage potentially available to the defendant, Philip Caouette, because the defendants have already received $20,000.00 in Personal Injury Protection benefits from ANPAC in connection with the Accident.  (Policy, Part IV; Correspondence from Attorney Rintoul to Attorney Broer, dated March 19, 2003; Defendant's Damage Analysis, dated September 30, 2003).

5.      During the period between September 22, 1998 and October 9, 1998, prior to the Accident, the defendant, Kimberly Caouette, a policyholder named in the Declarations, forwarded to ANPAC a hand-written and signed writing (hereinafter referred to as the "Cancellation Notice") that appeared to request that ANPAC cancel the Policy effective October 6, 1998.  (Cancellation Notice; transcript of the deposition of Kimberly Caouette, dated August 28, 2003 (hereinafter referred to as "Kimberly Caouette deposition"), page 34, line 17 through page 35, line 20; transcript of the deposition of Philip Caouette dated August 28, 2003 (hereinafter referred to as "Philip Caouette deposition"), page 27, line 15 through page 28, line 16 and page 30, lines 16-21; ¶11 of the defendants' Answer and Special Defenses, dated January 3, 2003).

6.      Kimberly Caouette initially wrote the number "9" on the Cancellation Notice signifying the month of September, then wrote a "10" over that number, signifying the month of October.  (Cancellation Notice;

Kimberly Caouette deposition, page 36, lines 6 through 12; Philip Caouette deposition, page 29, lines 3 through 6).

7.    Philip Caouette had no direct dealings with any insurance agents in the Fall of 1998, but he approved of his wife's decisions with respect to insurance matters.  (Philip Caouette deposition, page 22, line 18 through page 23, line 3).

8.    The underwriting log for the Policy, which was permanently stored on microfilm in May, 1999, does not contain any record of any telephone call from either defendant in 1998 concerning any underwriting issue.  (Underwriting log).

9.    It is unknown precisely when ANPAC received the Cancellation Notice, but ANPAC received the Cancellation Notice on or before October 11, 1998.  (McKenzie deposition, page 12, line 13 through page 14, line 22).

10.    The defendants mailed the Cancellation Notice to the accounting department at ANPAC (which does not process policy cancellations) rather than to the underwriting department (which does handle such cancellations).  (McKenzie deposition, page 12, line 13 through page 14, line 22).

11.    It is unknown when the underwriting department received the Cancellation Notice other than it had to be received on or before October 11, 1998.  (Kirby McKenzie deposition, page 12, line 13 through page 14, line 22).

12.   Pursuant to its regular course of business, ANPAC would have entered the cancellation of the Policy on its system on October 11, 1998.

13.   ANPAC's computer system processed the request on October 12, 1998.  (McKenzie deposition, page 25, line 25 through page 26, line 8; and page 32, lines 23 through 23).

14.   It was ANPAC's routine business practice at that time to process cancellation requests that were backdated less than thirty days, without requiring documentation concerning alternative insurance. (McKenzie deposition, page 9, line 21 through page 10, line 17).

15.   The defendants endorsed the premium refund check on or about October 29, 1998.  (Premium refund check).

16.   On October 10, 1998, the defendants notified ANPAC of the Accident.  (Activity Log).

17.   As of that date, the defendants' cancellation request had not been entered into ANPAC's computer system.  (McKenzie deposition, page 25, line 25 through page 26, line 8; and page 32, lines 23 through 23).

18.   ANPAC's claims department created a file to process Philip Caouette's claim for benefits in connection with the Accident.

19.   On or about September 23, 1999, Linda Herron wrote defendants' attorney, Ronald Scott of Brown, Paindiris & Scott, advising that Personal Injury Protection  benefits (hereinafter referred to as "PIP

benefits") would be exhausted soon, and asking if he foresaw an Underinsured Bodily Injury Claim. (Letter from Linda Herron to Ron Scott dated September 23, 1999.

20.  In response to that letter, Ronald Scott wrote Ms. Herron on or about October 15, 1999 that while discovery had just begun, there was a likelihood that there would be an underinsured bodily injury claim.  (Letter from Ronald Scott to Linda Herron dated October 15, 1999.

21.  By October 15, 1999, ANPAC's records reflected that the last date of coverage under the Policy was October 5, 1998, four days prior to the Accident.  (The defendants' Exhibit B, McKenzie deposition).

22.  ANPAC denied Philip Caouette's claim for uninsured/underinsured motorist benefits.

23.  The Policy provides, in pertinent part, the following:

**DEFINITIONS USED THROUGHOUT THIS POLICY**

(2)    "**You**" . . . mean[s] the Policyholder[s] named in the Declarations and spouse if living in the same household.

**PART IV - UNINSURED MOTORISTS**
**LIMITS OF LIABILITY**

Amounts payable will be reduced by . . .

2.    a payment under the [PIP] Coverage of this policy . . . .

**PART V - GENERAL PROVISIONS**

9.        **CANCELLATION . . . OF THIS POLICY**

**You** may cancel this policy by . . . advising us in writing when at a future date the cancellation is to be effective.

Upon cancellation **you** may be entitled to a premium refund; if so, we will send it to **you** . . . . If **you** cancel the policy, any return of premium will be refunded within 30 days following the company's receipt of the request for cancellation.

(Certified copy of the Policy).

25.    If there is coverage under the Policy, defendants are entitled to receive up to $80,000 in Bodily Injury Benefits under the Policy, depending upon the extent and nature of the injuries allegedly sustained by Philip Caouette as a result of the Accident.

26.    Kimberly Caouette was authorized to cancel the Policy effective October 6, 1998.  (Policy, PART V - GENERAL PROVISIONS; Philip Caouette deposition, page 22, line 18 through page 23, line 3).

27.    The Policy defines the word "you" to mean Philip and Kimberly Caouette and his or her spouse and the Policy allows "you," meaning either Philip or Kimberly Caouette, to cancel the Policy. (Policy).

28.    Issues concerning the extent and nature of the injuries allegedly sustained by Philip Caouette as a result of the Accident are not before the court in the instant declaratory judgment action.

8

**Proposed Conclusions of Fact**

**Plaintiff**:

1.      Prior to the Accident, the defendants forwarded to ANPAC a
written and signed unconditional request that the Policy be
cancelled effective October 6, 1998, thereby intending to
cancel the Policy effective October 6, 1998.  (Cancellation
Notice; Kimberly Caouette deposition, page 34, line 17
through page 35, line 20 and page 36, lines 3 through 12
and page 37, lines 19 through 21 and page 38, line 10
through page 41, line 25; Philip Caouette deposition, page
27, line 15 through page 28, line 16 and page 29, lines 3
through 6 and page 30, lines 16-21 and page 31, lines 1
through 4 and page 33, lines 2 through 5; ¶11 of the
defendants' Answer and Special Defenses, dated January 3,
2003; McKenzie deposition, page 12, line 13 through page
14, line 22 and page 24, lines 16 through 22 and page 41,
lines 10-25 and page 25, line 25 through page 26, line 8 and
page 32, lines 23 through 23; underwriting log; Minnesota
Department of Public Safety Notice of Proposed Revocation
of Vehicle License; Activity Log).

2.      By forwarding to ANPAC a written and signed unconditional
request that the Policy be cancelled effective October 6,
1998, the defendants exercised their express right under

Minnesota law to cancel the Policy. (Minnesota Statutes §72A.20, Subsection17 (e); Cancellation Notice; Kimberly Caouette deposition, page 34, line 17 through page 35, line 20 and page 36, lines 3 through 12 and page 37, lines 19 through 21 and page 38, line 10 through page 41, line 25; Philip Caouette deposition, page 27, line 15 through page 28, line 16 and page 29, lines 3 through 6 and page 30, lines 16-21 and page 31, lines 1 through 4 and page 33, lines 2 through 5; ¶11 of the defendants' Answer and Special Defenses, dated January 3, 2003; McKenzie deposition, page 12, line 13 through page 14, line 22 and page 24, lines 16 through 22 and page 41, lines 10-25 and page 25, line 25 through page 26, line 8 and page 32, lines 23 through 23; underwriting log; Minnesota Department of Public Safety Notice of Proposed Revocation of Vehicle License; Activity Log).

3.      The Cancellation Notice is explicit and unconditional and requests cancellation as of a date certain. Namely, October 6, 1998. (Cancellation Notice; Kimberly Caouette deposition, page 34, line 17 through page 35, line 20; Philip Caouette deposition, page 27, line 15 through page 28, line 16 and page 30, lines 16-21).

4.    By forwarding to ANPAC a written and signed unconditional request that the Policy be cancelled effective October 6, 1998, the defendants exercised their express right under the Policy to cancel the Policy by advising ANPAC in writing when the cancellation was to be effective.  (Policy, Part V, Section 9; Cancellation Notice; Kimberly Caouette deposition, page 34, line 17 through page 35, line 20 and page 36, lines 3 through 12 and page 37, lines 19 through 21 and page 38, line 10 through page 41, line 25; Philip Caouette deposition, page 27, line 15 through page 28, line 16 and page 29, lines 3 through 6 and page 30, lines 16-21 and page 31, lines 1 through 4 and page 33, lines 2 through 5; ¶11 of the defendants' Answer and Special Defenses, dated January 3, 2003; McKenzie deposition, page 12, line 13 through page 14, line 22 and page 24, lines 16 through 22 and page 41, lines 10-25 and page 25, line 25 through page 26, line 8 and page 32, lines 23 through 23; underwriting log; Minnesota Department of Public Safety Notice of Proposed Revocation of Vehicle License; Activity Log).

5.    The Cancellation Notice complied with Minnesota law and the terms of the Policy.  (Minnesota Statutes §72A.20, Subsection17 (e); Policy, Part V, Section 9).

6.    When, or about October 11, 1998, ANPAC honored the
defendants' clear cancellation request by making the
cancellation effective October 6, 1998, it was complying with
Minnesota law.  (Cancellation Notice; Minnesota Statutes
§72A.20, Subsection 17(e); McKenzie deposition, page 12,
line 13 through page 14, line 22 and page 24, lines 16
through 22 and page 41, lines 10-25 and page 25, line 25
through page 26, line 8 and page 32, lines 23 through 23;
underwriting log; defendants' Exhibit B, McKenzie
deposition).

7.    Because Kimberly Caouette initially wrote the number "9" on
the Cancellation Notice signifying the month of September,
then wrote a "10" over that number, signifying the month of
October, then had Kimberly Caouette intended to write a
number other than "6," she would have corrected her error.
(Kimberly Caouette deposition, page 34, line 17 through
page 35, line 20 and page 36, lines 3 through 12 and page
37, lines 19 through 21 and page 38, line 10 through page
41, line 25; Philip Caouette deposition, page 27, line 15
through page 28, line 16 and page 29, lines 3 through 6 and
page 30, lines 16-21 and page 31, lines 1 through 4 and
page 33, lines 2 through 5).

8.  Because the defendants endorsed the premium refund
    check representing a return of unearned premium after
    October 5, 1998, they intentionally cancelled the Policy
    effective October 6, 1998.  (Premium refund check).

9.  Because the defendants never contacted ANPAC in writing
    concerning any alleged erroneous notations on the
    Cancellation Notice, even after the Minnesota Department of
    Public Safety forwarded notice to the defendants on or about
    October 22, 1998 that the Policy was cancelled effective
    October 6, 1998, and because there is no record that they
    ever advised ANPAC verbally of any such alleged error, the
    defendants intentionally cancelled the Policy effective
    October 6, 1998.  (Minnesota Statutes §72A.20,
    Subsection17 (e); Cancellation Notice; Kimberly Caouette
    deposition, page 34, line 17 through page 35, line 20 and
    page 36, lines 3 through 12 and page 37, lines 19 through
    21 and page 38, line 10 through page 41, line 25; Philip
    Caouette deposition, page 27, line 15 through page 28, line
    16 and page 29, lines 3 through 6 and page 30, lines 16-21
    and page 31, lines 1 through 4 and page 33, lines 2 through
    5; McKenzie deposition, page 12, line 13 through page 14,
    line 22 and page 24, lines 16 through 22 and page 41, lines
    10-25 and page 25, line 25 through page 26, line 8 and page

32, lines 23 through 23; underwriting log; Minnesota
Department of Public Safety Notice of Proposed Revocation
of Vehicle License).

10.    There is no evidence indicating when the defendants first
discussed the issue of automobile insurance with their
Connecticut insurance agent, Edward Lewis, or when they
applied for automobile liability coverage with Allstate or why
coverage with Allstate was not made effective until October
16, 1998.  (Kimberly Caouette deposition, page 33, line 9
through page 34, line 9; Philip Caouette deposition, page 24,
line 15 through page 25, line 11).

11.    The defendants did not have automobile liability insurance
during the period between October 6, 1998 and October 16,
1998, when their Allstate policy went into effect.  (Allstate
documents).

12.    The earliest document referencing any Allstate automobile
policy is dated October 27, 1998.  (Allstate documents).

13.    Because the defendants never asserted, prior to March 20,
2003, that Kimberly Caouette supposedly telephoned
ANPAC between October 6, 1998 and October 9, 1998 to
"retract" the subject Cancellation Notice, the defendants
intentionally cancelled the Policy effective October 6, 1998.

14.    No coverage under the Policy existed as of October 6, 1998. (Cancellation Notice; Defendants' Exhibit B, McKenzie deposition).

15.    All benefits paid to the defendants were paid by mistake because, at the time when the claim for benefits was initially made, on or about October 10, 1998, the defendants' cancellation request had not been entered into ANPAC's computer system and because when Philip Caouette first asserted a possible claim for uninsured/underinsured motorist benefits on or about October 15, 1999, ANPAC denied his claim for such benefits because, by that time, ANPAC's records reflected that the last date of coverage under the Policy was October 5, 1998, four days prior to the Accident.  (Activity Log; McKenzie deposition, page 12, line 13 through page 14, line 22 and page 24, lines 16 through 22 and page 41, lines 10-25 and page 25, line 25 through page 26, line 8 and page 32, lines 23 through 23; correspondence from Attorney Rintoul directed to ANPAC, dated October 15, 1999; defendants' Exhibit B, McKenzie deposition).

16.    ANPAC never waived its right to deny underinsured motorists coverage to the defendants based upon the defendants' cancellation of the Policy effective October 6,

1998 because it never paid any benefits to the defendants knowing it was entitled to exercise such a right with knowledge that the defendants cancelled the Policy effective prior to the date of the Accident.  (Activity Log; McKenzie deposition, page 12, line 13 through page 14, line 22 and page 24, lines 16 through 22 and page 41, lines 10-25 and page 25, line 25 through page 26, line 8 and page 32, lines 23 through 23; correspondence from Attorney Rintoul directed to ANPAC, dated October 15, 1999; defendants' Exhibit B, McKenzie deposition).

17.    The defendants did not obtain automobile liability insurance through Allstate until October 27, 1998, at which time Allstate made the Allstate policy effective October 16, 1998. (Allstate documents).

18.    ANPAC was unaware, when it processed the PIP claim on October 10, 1998, that the defendants requested that the Policy be cancelled effective October 6, 1998.  (McKenzie deposition, page 25, line 25 through page 26, line 8; and page 32, lines 23 through 23). On October 12, 1998, ANPAC notified the Minnesota Department of Public Safety that the Policy was terminated effective October 6, 1998.  (Minnesota Department of Public Safety Notice of Proposed Revocation of Vehicle License).

19. The Minnesota Department of Public Safety received the notification on October 13, 1998 and, on October 22, 1998, it forwarded the notification to the defendants at the same address to which ANPAC mailed the defendants' premium refund check. (Minnesota Department of Public Safety Notice of Proposed Revocation of Vehicle License).

20. On or about October 15, 1999, Philip Caouette first asserted a possible claim for uninsured/underinsured motorist benefits. (Correspondence from Attorney Scott directed to ANPAC, dated October 15, 1999).

21. There is no evidence establishing that the Cancellation Notice did not comply with the Policy's cancellation provisions. (Cancellation Notice; Kimberly Caouette deposition, page 36, lines 3 through 5; Philip Caouette deposition, page 31, lines 1 through 4; McKenzie deposition, page 24, lines 16 through 22).

22. There is no evidence indicating the precise dates when the Cancellation Notice was drafted or mailed by the defendants or received by ANPAC. (Cancellation Notice; Kimberly Caouette deposition, page 36, lines 3 through 5; Philip Caouette deposition, page 31, lines 1 through 4; transcript of the deposition of Kirby McKenzie dated October 14, 2003

(hereinafter referred to as "McKenzie deposition"), page 24, lines 16 through 22)

23. In October, 1998, ANPAC logged all calls it received from its insureds, no matter how big or small the insured's problem or requests were, in an underwriting log. (McKenzie deposition, page 41, lines 10-25).

24. Kimberly Caouette has no records or specific recollection concerning the alleged telephone call, and she does not know what date or day of the week she made the alleged call, what time of day it was when she made the call or even whether the ANPAC representative with whom she spoke was a male or female. (Kimberly Caouette deposition, page 38, line 10 through page 41, line 25).

25. The defendants never contacted ANPAC in writing concerning any alleged erroneous notations on the Cancellation Notice. (Kimberly Caouette deposition, page 37, lines 19 through 21; Philip Caouette deposition page 33, lines 2 through 5).

26. There is no evidence that any party to the insurance contract failed to comply with its terms.

27. There is no evidence establishing that the Cancellation Notice was drafted on or after October 6, 1998. (Cancellation Notice; Kimberly Caouette deposition, page

36, lines 3 through 5; Philip Caouette deposition, page 31, lines 1 through 4; McKenzie deposition, page 24, lines 16 through 22).

28. There is no evidence the Cancellation Notice was drafted on or after October 6, 1998.

29. Pursuant to its regular course of business, ANPAC entered the cancellation of the Policy on its system effective October 6, 1998.

30. On October 12, 1998, ANPAC issued a premium refund check to the defendants in the amount of $85.00 representing the premium ANPAC did not earn because the defendants requested cancellation of the Policy effective October 6, 1998.  (Premium refund check).

31. Pursuant to its regular course of business, ANPAC entered the cancellation of the Policy on its system on October 11, 1998, effective October 6, 1998.

**Defendant**:

1. Kimberly Caouette obtained automobile insurance to replace the ANPAC policy at the same time she obtained homeowner's insurance for the home she was purchasing on March 9, 1998. Homeowners Policy Declarations, page 2, showing that given a discount of 15% on homeowner's policy because also obtained automobile coverage.

19

2.     Kimberly Caouette obtained replacement automobile coverage effective October 16, 1998, the date she believed she had cancelled the Policy.

3.     Kimberly Caouette would not have intentionally gone without automobile insurance.

4.     Kimberly Caouette prepared the cancellation request and gave it to Philip Caouette to mail on October 6, 1998.

5.     Kimberly Caouette meant to cancel the ANPAC policy as of October 16, 1998, which was the effective date of the Allstate replacement policy she obtained.

6.     Kimberly Caouette called ANPAC between October 6 and 9, 1998 to clarify that she intended to cancel the policy as of October 16, not October 6.  Deposition of Kimberly Caouette at page 38, line 15.

7.     In the period between giving the notice to Phil Caouette to mail and October 9, Kimberly Caouette wrote on her copy of the cancellation notice that the date should have been October 16, 1998.

8.     When giving ANPAC notice of the claim, Kimberly Caouette told the ANPAC representative that she had sent in a cancellation notice mistakenly requesting cancellation as of October 6 rather than October 16, as she intended. Deposition of Kimberly Caouette,  page 43, line21.

9.      She was told by ANPAC that everything was fine and the policy was still in effect.  Deposition of Kimberly Caouette, page 43, line21.

10.     Defendants did not intend to ratify plaintiff's cancellation of the Policy by negotiating the premium refund check.  Due to their pending claim, they were expecting checks from ANPAC for property damage and did not know that the $85 check represented a return of premium or could be interpreted as their agreement to cancellation of the Policy as of October 6, 1998.

11.     No evidence exists that ANPAC received the cancellation request prior to defendants claiming benefits under the policy.

12.     ANPAC acted as if the Policy was in full force and effect until 2001 when it first denied coverage. Defendants gave ANPAC notice of a claim on the policy on October 10, 1998.

13.     At the time ANPAC processed the request, defendant's claim had already been entered on ANPAC's computer system, as reflected on the policy history report.

14.     On October 12, 1998, ANPAC issued a premium refund check to the defendants in the amount of $85.00 representing the premium ANPAC did not earn because

plaintiff processed the cancellation effective October 6, 1998.  (Premium refund check).

15. ANPAC paid benefits on the Policy from October 1998 through March 2001 because it believed that defendants had revoked the cancellation notice by the time ANPAC entered the cancellation request on its system.

16. Defendants' claim on the Policy October 10, 1998 expressed their intent to revoke any notice of cancellation.

17. Defendants did not intentionally forego the benefit of the Policy, which provides up to $100,000 in liability coverage plus property damage, in order to earn the right to receive an $85 premium refund check

18. The cancellation request was not a request to cancel the Policy as of a future date.

19. ANPAC processed the cancellation request no earlier than October 11, 1998.

**Stipulated Conclusions of Law**

1. Minnesota law applies with respect to the determination of whether there is coverage under the Policy because the bulk of the contracting transactions took place in Minnesota, Minnesota has the most significant relationship to the instant dispute, the Policy was negotiated and issued in Minnesota, the Policy insured a vehicle that was registered and garaged in Minnesota, the Policy

was issued to insureds who were residents of Minnesota, the premiums were mailed from Minnesota and, the defendant, Philip Caouette was driving with a Minnesota driver's license at the time of the Accident. (<u>Interface Flooring Systems, Inc. v. Aetna Cas. and Sur. Co.</u>, 261 Conn. 601, 804 A.2d 201 (2002); <u>Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.</u>, 243 Conn. 401, 406-14, 703 A.2d 1132, 1135-1138 (1997) ("<u>Reichhold I</u>"); <u>Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.</u>, 252 Conn. 774, 778 750 A.2d 1051, 1053-1054 (2000)("<u>Reichhold II</u>")).

2.    In Minnesota, general principles of contract interpretation apply to insurance policies. (<u>Edgley v.</u> Lappe, 342 F.2d 884, 888 (8th Cir. 2003); <u>Lobeck v. State Farm Mut. Auto. Ins. Co.</u>, 582 N.W.2d 246, 249 (Minn.1998); <u>Midwest Family Mut. Ins. Co. v. Schmitt</u>, 651 N.W.2d 843, 845 (Minn.App.,2002); <u>Andrew L. Youngquist, Inc. v. Cincinnati Ins. Co.</u>, 625 N.W.2d 178,183 (Minn.App., 2001)).

3.    In order to constitute notice of cancellation under Minnesota law, the notice must be explicit, unconditional, and use unequivocal language and must state that the policy is, or without further notice will stand, canceled as of a certain day. (<u>McQuarrie v. Waeca Mut. Ins. Co.</u>, 337 N.W.2d 685, 687 (Minn. 1983)).

4.      Rescission of an insurance contract may be accomplished by

mutual agreement.  (<u>Merchants & Farmers Mutual Casualty Co. v.

St. Paul-Mercury Indemnity Co.</u>, 8 N.W.2d 827, 828 (1943)).

5.      Whether such a rescission has been accomplished depends on the

intent of the parties as evidenced by their acts.  (<u>McQuarrie</u>, at

688).

**Proposed Conclusions of Law**

   **Plaintiff**:

1.      By forwarding the Cancellation Notice to ANPAC prior to the

Accident, the defendants intentionally and unambiguously

exercised their express right under Minnesota law to cancel

the Policy.  (M.S. §72A.20).

2.      The defendants intentionally exercised their right under the

Policy to cancel the Policy by advising ANPAC in writing

when the cancellation was to be effective.  (Policy, Part V,

Section 9).

3.      The Cancellation Notice complied with Minnesota law and

the terms of the Policy.  (Cancellation Notice; M.S. §72A.20;

Policy, Part V, Section 9).

4.      On or about October 11, 1998, ANPAC honored the

defendants' clear cancellation request and complied with

Minnesota law by making the cancellation effective October

6, 1998.  (Cancellation Notice; M.S. §72A.20; Policy, Part V, Section 9).

5.    The defendants' act of endorsing the premium refund check representing return of unearned premium after October 5, 1998, manifested their intent to cancel the Policy effective October 6, 1998.  (M.S. §72A.20; <u>Mutual of Omaha Ins. Co. v. Korengold</u>, 241 N.W.2d 651, 652 (1976)).

6.    The defendants' failure ever to contact ANPAC in writing concerning any alleged erroneous notations on the Cancellation Notice combined with the fact that there exists no record at ANPAC that the defendants ever advised ANPAC verbally of any such error, supports the legal conclusion that the defendants intended to cancel the Policy effective October 6, 1998.  (M.S. §72A.20; <u>McQuarrie</u>, at 688).

7.    The defendants' failure to contact ANPAC verbally or in writing concerning any alleged erroneous notations on the Cancellation Notice after the Minnesota Department of Public Safety forwarded notice to the defendants on or about October 22, 1998 that the Policy was cancelled effective October 6, 1998, supports the legal conclusion that the defendants intended to cancel the Policy effective October 6, 1998.  (M.S. §72A.20; <u>McQuarrie</u>, at 688).

8.    The defendants' delay until March 20, 2003, to claim that
      Kimberly Caouette telephoned ANPAC between October 6,
      1998 and October 9, 1998 to "retract" the Cancellation
      Notice, combined with the fact that there exists no record at
      ANPAC that the defendants ever advised ANPAC of any
      such error, supports the legal conclusion that the defendants
      intended to cancel the Policy effective October 6, 1998.
      (M.S. §72A.20; McQuarrie, at 688).

9.    ANPAC is not estopped from denying coverage under the
      Policy because the defendants cancelled the Policy effective
      prior to the date of the Accident and the doctrine of estoppel
      will not operate to enlarge coverage under an insurance
      policy or create coverage where no coverage existed prior to
      the loss.  (Northwest Airlines, Inc., 32 F.3d at357; Shannon,
      276 N.W.2d at 78; Writer's, Inc., 465 N.W.2d at 423;
      Rudzinski, 347 N.W.2d at 851; Winthrop And Weinstine,
      P.A., 187 F.3d at 877).

10.   Because ANPAC would be entitled to recover any amounts
      paid to the defendants by mistake which exceeds the liability
      fixed by the Policy, it necessarily follows that it may properly
      deny coverage for underinsured motorist benefits even after
      it mistakenly paid other  benefits under the Policy.
      (Bachrach, 265 Minn. 83, 90-91 120 N.W. 2d 327, 332-333

(1963); <u>Winthrop and Weinstine</u>, 993 F. Supp. at 1257;

<u>Wallace</u>, 302 N.W.2d at 341; <u>Rudzinski</u>, 347 N.W.2d at 852).

11.  ANPAC has never waived its right to deny that the Policy

was not in effect on the date of the Accident because it

never waived such right knowing it was entitled to exercise

such a right with knowledge that the defendants cancelled

the Policy effective prior to the date of the Accident.

(<u>Lievers</u>, 257 Minn. at 272; <u>Blazek</u>, 251 Minn. at 142-43).

12.   Coverage cannot be created by estoppel in this case

because no coverage existed at the time of the subject loss.

(<u>Northwest Airlines, Inc.</u>, 32 F.3d at357; <u>Shannon</u>, 276

N.W.2d at 78; <u>Writer's, Inc.</u>, 465 N.W.2d at 423; <u>Rudzinski</u>,

347 N.W.2d at 851; <u>Winthrop And Weinstine, P.A.</u>, 187 F.3d

at 877).

13.  ANPAC is not precluded from asserting that the Policy was

cancelled effective October 6, 1998 merely because it paid

benefits under the Policy because ANPAC was unaware,

when it initially processed the defendants' claim on October

10, 1998, that the defendants had requested that the Policy

be cancelled effective October 6, 1998.  (<u>Lievers</u>, 257 Minn.

at 272; <u>Blazek</u>, 251 Minn. at 142-43).

14.  Under Minnesota law, an insurance contract may be

cancelled even where the parties do not strictly comply with

the contract's cancellation requirements or where there is
not strict compliance with statutory requirements.  (<u>R.T.
Harper v. Lyndon Life Ins. Co.</u>, 1999 WL 203510
(Minn.App.,1999); <u>Evans v. G.E.I.C.O.</u>, 257 N.W.2d 689, 692
(Minn. 1977)).

6.    An insured's acceptance and use of a premium refund check
manifests an intent to cancel the policy.  (<u>Mutual of Omaha
Ins. Co. v. Korengold</u>, 241 N.W.2d 651, 652 (1976)).

7.     Under Minnesota law, the doctrine of estoppel will not
operate to enlarge coverage under an insurance policy or
create coverage where no coverage existed prior to the loss.
(<u>Northwest Airlines, Inc. v. Federal Ins. Co.</u>, 32 F.3d 349,
357 (8th Cir. 1994); <u>Shannon v. Great American Ins. Co.</u>, 276
N.W.2d 77, 78 (Minn. 1979); <u>Writer's, Inc. v. West Bend Mut.
Ins. Co.</u>, 465 N.W.2d 419, 423 (Minn. App. 1991); <u>Minnesota
Mutual Fire & Casualty Co, Rudzinski</u>, 347 N.W.2d 848, 851
(Minn.App. 1984); <u>Winthrop And Weinstine, P.A. v. Travelers
Casualty and Surety Co.</u>, 187 F.3d 871, 877 (8th Cir. 1999)).

8.    Under Minnesota law, an insurer is entitled to recover an
amount paid to an insured by mistake that  exceeds the
liability fixed by an insurance policy.  (<u>Equitable Life
Insurance Society of U.S. v. Bachrach</u>, 265 Minn. 83, 90-91
120 N.W. 2d 327, 332-333 (1963); <u>Winthrop and Weinstine

v. Travelers Cas. And Sur. Co., 993 F. Supp. 1248, 1257 (D. Minn. 1998); Wallace v. Tri-State Ins. Co., 302 N.W.2d 337, 341 (Minn. 1980); Rudzinski, 347 N.W.2d at 852).

9.      Under Minnesota law, an insurer's right to deny the existence of a policy may be waived only under circumstances where an insurer entitled to exercise such a right, with knowledge of the situation, treats the contract as in force and deals with the insured in a manner consistent only with a purpose on its part to regard the contract as still subsisting and not terminated.  (Lievers v. National Ins. Underwriters, 257 Minn. 268, 272, 101 N.W.2d 817, 820 (Minn.,1960); Blazek v. North American Life & Casualty Co., 251 Minn. 130, 142-43, 87 N.W.2d 36, 45-46 (1957)).

10.     Pursuant to Minnesota law, ANPAC was required to give effect to the defendants' express request that the Policy be cancelled effective October 6, 1998.  (Minnesota Statutes §72A.20, Subsection17 (e)).

11.     Pursuant to Minnesota law, the defendants were entitled to cancel the Policy at any time.  (Minnesota Statutes §72A.20, Subsection17 (e)).

12.     Pursuant to Minnesota law, the defendants were not limited to canceling the Policy only by specifying a future date when

the cancellation was to be effective.  (Minnesota Statutes §72A.20, Subsection17 (e)).

13.  Pursuant to Minnesota law, ANPAC could not have enforced the "future date" clause.  (Minnesota Statutes §72A.20, Subsection17 (e)).

14.  ANPAC's routine business practice of processing cancellation requests that were backdated less than thirty days, without requiring documentation concerning alternative insurance, is consistent with Minnesota law.  (Minnesota Statutes §72A.20, Subsection17 (e)).

15.  Minnesota Statutes §72A.20, Subsection17 (e) provides that: "The owner [of an insurance policy] may cancel [that policy] . . . at <u>any</u> <u>time</u> during the policy period.  This provision supersedes any inconsistent provision of law or any inconsistent policy provision."  (Emphasis added.)  (<u>Id</u>).

16.  ANPAC has satisfied its burden of showing that the conditions for cancellation of the Policy pursuant to the Policy were satisfied.

17.  ANPAC has satisfied its burden of showing that the conditions for cancellation of the Policy pursuant to M.S. §72A.20 were satisfied.

18.  The defendants never revoked their express intent to cancel the Policy effective October 6, 1998.

19.   The defendants' conduct in making a claim for PIP benefits under the Policy did not constitute a revocation of their express request that the Policy be cancelled effective October 6, 1998.

20.   The defendants' conduct in negotiating the premium refund check demonstrated their intent to accept cancellation of the Policy effective October 6, 1998.

21.   Under Minnesota law, ANPAC was not required to act, on or before October 9, 1998, on the defendants' express request that the Policy be cancelled effective October 6, 1998.

22.   ANPAC is not estopped from claiming that the Policy was cancelled October 6, 1998.

23.   ANPAC never treated the Policy as being in effect until 2001 knowing that the defendants expressly cancelled the Policy effective October 6, 1998.

24.   The defendants' conduct in submitting their claim under the Policy before ANPAC processed the defendants' express request that the Policy be cancelled effective October 6, 1998 did not obligate ANPAC to pay any and all benefits under the Policy absent the defendants' intentional release of ANPAC from such obligation.

**Defendant**

1.    The burden of proof is on plaintiff to establish that all conditions precedent to cancellation of the Policy were fulfilled.

2.    Plaintiff has failed to meet its burden of showing that the conditions for cancellation of the Policy pursuant to the Policy were satisfied.

3.    Plaintiff has failed to meet its burden of showing that the conditions for cancellation of the Policy pursuant to M.S. §72A.20.

4.    Defendant's request to cancel the policy was revoked when defendants evidenced their intent to revoke the cancellation request by making a claim under the Policy before plaintiff acted on the cancellation request.

5.    Defendants' negotiation of the refund check did not demonstrate their intent to accept cancellation of the Policy. McQuarrie v. Waseca Mutual Insurance Co., 337 N.W.2d 685, 687 (1983); Kilty v. Mutual of Omaha Insurance Company, 287 Min 403, 178 N.W.2d. 734, 736 (1970).

6.    Plaintiff was required to act on the request for cancellation before the cancellation could take effect

7.    ANPAC is estopped from claiming that the Policy was cancelled October 6, 1998 because it treated the Policy as in full force and effect until 2001.

8.    By making a claim on the Policy before it was cancelled, ANPAC became contractually committed to pay the benefits under the Policy unless defendants intentionally released ANPAC from such obligation.

9.    Minn. Stat. §72A does not require an insurer to honor every request for a retroactive cancellation of an insurance policy.

## 7.    TRIAL BRIEFS

Plaintiff's is attached.  Defendants' will be submitted under separate cover.

## 8.    WITNESSES

**Witnesses Likely To Testify:**

**Plaintiff**:

Mr. Timothy Barnes
Litigation Specialist
ANPAC
American National Corporate Centre
1949 East Sunshine
Springfield, Missouri  65899-0001

Timothy Barnes is expected to testify concerning the defendants' cancellation of the Policy and ANPAC's policies and procedures concerning the processing of automobile insurance claims.

Mr. Kirby McKenzie
Underwriting Manager
ANPAC
American National Corporate Centre
1949 East Sunshine

Springfield, Missouri  65899-0001

Kirby McKenzie is expected to testify concerning the defendants'
cancellation of the Policy and ANPAC's policies and procedures
concerning the cancellation of automobile insurance policies.

**Defendants**:

Philip Caouette
35 Butler Drive
Glastonbury, Connecticut

Defendants anticipate that Mr. Caouette will testify regarding his
family's move to Connecticut, faxing and mailing of the cancellation
notice, the closing on their house, giving notice of the claim and
facts related to the accident and benefits plaintiff paid under the
Policy.

Kimberley Caouette
35 Butler Drive
Glastonbury, Connecticut

Defendants anticipate that she will testify as to her family's move to
Connecticut, efforts to obtain new homeowners and automobile
insurance, the preparation and transmittal of the cancellation
notice, actions she took to assure that coverage with plaintiff
remained in effect, giving notice of the claim and facts related to the
accident and benefits paid under the policy.

**Witnesses To Be Called Only If Need arises:**

**Plaintiff**:

Kimberly Caouette
35 Butler Drive
Glastonbury, Connecticut

The defendant, Kimberly Caouette, is expected to testify

concerning the defendants' cancellation of the Policy.

Philip Caouette
35 Butler Drive
Glastonbury, Connecticut

The defendant, Philip Caouette, is expected to testify concerning

the defendants' cancellation of the Policy.

9.   **TRIAL EXHIBITS**

**Plaintiff:**

Exhibit 1:     Certified copy of policy no. 22-A-J21-113-5

Exhibit 2:     One-page Cancellation Notice (stamped 0094)

Exhibit 3:     Defendants' Answer and Special Defenses, dated January 3,

2003.

Exhibit 4:     Two-page letter from Attorney Rintoul to Attorney Broer

dated March 19, 2003.

Exhibit 5:     Defendants' damage analysis, dated September 30, 2003.

Exhibit 6:     One-page underwriting log (stamped 0091).

Exhibit 7:     One-page Notice of Proposed Revocation of Vehicle License

from the Minnesota Department of Public Safety Driver and

Vehicle Services Division No-Fault Compliance Office (stamped 0090).

Exhibit 8:    Activity Log, 10/10/98 – 10/12/98 (stamped 0038).

Exhibit 9:    One-page correspondence from Attorney Scott to Linda Herron, dated October 15, 1999 (stamped 0057).

Exhibit 10:    Allstate automobile insurance policy.

Exhibit 11:    One-page correspondence from Ed Lewis to the defendants dated October 27, 1998.

Exhibit 12:    Two-page Allstate automobile insurance identification card for policy no. 0 25 333499 10-16.

Exhibit 13:    Four-page Allstate Insurance Company auto policy declarations, reflecting information concerning the defendants' Policy Number 025333499 as of October 27, 1998.

Exhibit 14:    One-page premium refund check in the amount of $85.00, dated 10/12/98 (stamped 0114).

Exhibit 15:    One-page policy history (stamped 0131).

Exhibit 16:    Sixteen-page subpoena served upon the Allstate Insurance Company, dated August 29, 2003, including Return of Service.

Exhibit 17:    One-page correspondence from Jack Donahue to Attorney Broer discussing Allstate Insurance Company's compliance with subpoena.

Exhibit 18:   Two-page Statement of Account for the defendants' Policy

Number 025329554.

Exhibit 19:   Four-page Statement of Account for the defendants' Policy

Number 025333499.

Exhibit 20:   Seven-page correspondence from Allstate Customer Service

to the defendants reflecting information concerning the

defendants' Policy Number 025329554 as of October 12,

1998.

Exhibit 21:   Twelve-page correspondence from Allstate Customer

Service to the defendants reflecting information concerning

the defendants' Policy Number 025329554 as of October 23,

1998.

Exhibit 22:   Eleven-page correspondence from Allstate Customer

Service to the defendants reflecting information concerning

the defendants' Policy Number 025329554 as of October 27,

1998.

Exhibit 23:   Thirty-five-page correspondence from Ed Lewis to the

defendants reflecting information concerning the defendants'

Policy Number 025333499 as of October 27, 1998.

Exhibit 24:   Seven-page correspondence from Ed Lewis to the

defendants reflecting information concerning the defendants'

Policy Number 025333499 as of October 29, 1998.

Exhibit 25:    Five-page correspondence from Ed Lewis to the defendants reflecting information concerning the defendants' Policy Number 025333499 as of November 3, 1998.

Exhibit 26:    Seven-page correspondence from Allstate Customer Service to the defendants reflecting information concerning the defendants' Policy Number 025333499 as of November 5, 1998.

Exhibit 27:    One-page premium refund check dated November 3, 1997.

**Defendants:**

501    Premium notices with a due date of 1-16-98, with post-it note directing Philip Caouette to fax it to Ed Lewis, their insurance agent in Connecticut.

502    Expense account records of Philip Caouette showing dates he was likely to be in office at the time he was asked by his wife to fax the premium notice to Ed Lewis.

503    Allstate Policy Declarations from the Ed Lewis Agency to Kimberly E and Philip L. Caouette, with a "Information as of October 7, 1998" notation.

504    Cancellation notice, with added notation "S/B 10/16/98."

505    Allstate Temporary Insurance Card with an effective date of 1-16-98.

506   Evidence of Homeowner's Insurance dated October 5, 1998 and faxed 10/6/98.

507   March 20, 2001 letter from ANPAC to Ronald Scott, constituting defendants' first notice that ANPAC was denying coverage.

508   Records of ANPAC's payment of Personal Injury Payments.

509   Checks dated November 4, 1998 for $3,361.88 and October 29, 1998 for $6,207.50 representing property damage claims paid by plaintiff.

510   Letter dated September 23, 1999 from Linda Herron to Ron Scott.

**10.   DEPOSITION TESTIMONY**

None.

**11.   ANTICIPATED EVIDENTIARY PROBLEMS**

None.

**PLAINTIFF,**
**AMERICAN NATIONAL PROPERTY**
**AND CASUALTY COMPANY**

By _____       Date: _____
        Stephen H. Broer
        HALLORAN & SAGE  LLP
        Fed. Bar #ct21637
        One Goodwin Square
        225 Asylum Street
        Hartford, CT 06103
        (860) 522-6103

**DEFENDANTS,**
**PHILIP L. CAOUETTE and**
**KIMBERLY CAOUETTE**


By_____          Date: _____
      David S. Rintoul
      Brown Paindiris & Scott LLP
      Fed. Bar #ct08456
      2252 Main Street
      Glastonbury, CT 06033
      (860) 659-0700

## <u>CERTIFICATION</u>

This is to certify that on this 29th day of March, 2004, a copy of the foregoing Joint Trial Memorandum was mailed, postage-paid to:

David S. Rintoul, Esq.
Brown Paindiris & Scott LLP
2252 Main Street
Glastonbury, CT  06033

_____
Stephen H. Broer

532521.1(HSFP)

41